IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ALFREDO AMECA-RODRIGUEZ and )
JULES LEYVA, )
 )
Plaintiffs, )
 )
v. )    CV 01-JEO-3145-S
 )
COMPTRAC, SAMUEL B. ROBERTS, M.D., )
SOUTHERN MEDICAL GROUP, SHELLY )
RHODES WEISENFELD, M.D., JAMES O. )
POWELL, and OPHTHALMOLOGY )
ASSOCIATES, )
 )
Defendants. )

03 DEC 30 AM 11: 46

U.S. DISTRICT COURT
N.D. OF ALABAMA

**ENTERED**

DEC 30 2003

## MEMORANDUM OPINION

Presently before the court are the motions for summary judgment filed by defendants

Shelly Rhodes Weisenfeld, M.D. (hereinafter "Weisenfeld") and Southern Medical Group (doc.

86); James O. Powell, M.D. (hereinafter "Powell") and Ophthalmology Associates, P.C. (doc.

89); and Samuel B. Roberts, M.D. (hereinafter "Roberts") (doc. 94), concerning the remaining

claims in the plaintiffs' amended complaint. (Doc. 53). The issues have been fully briefed by

the parties and a hearing on the motions was conducted on December 12, 2003. Premised on the

briefs, the arguments of counsel, and the record, the court finds that the motions are due to be

denied.

Although the plaintiffs allege numerous claims against the various defendants, the sum

and substance of this lawsuit concerns the question of whether Roberts, Weisenfeld, or Powell

committed medical malpractice or were negligent in their treatment of Alfredo Ameca-Rodriguez

(hereinafter "Ameca-Rodriguez") following infliction of a work injury to his eye. The claims are

*106*

principally brought pursuant to the Alabama Medical Liability Act (hereinafter "AMLA").[1]

## STANDARDS OF REVIEW

Each defendant asserts that the plaintiffs cannot demonstrate that his or her individual conduct was the proximate cause of Ameca-Rodriguez's loss of his eye.  (Doc. 86 at 4; Doc. 89 at 4; Doc. 95 at 5).  The plaintiffs counter that the evidence adduced during the depositions of their experts is sufficient.  (Doc. 99 at 2).

### Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The party asking for summary judgment bears the initial burden of showing that no genuine issues exist.  *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.,* 398 U.S. 133, 157 (1970).  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial.  *See Celotex,* 477 U.S. at 324.  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be

---

[1] The AMLA is found at ALABAMA CODE §§ 6-5-480, *et seq.* and 6-5-540, *et seq.*

2

believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless,

the nonmovant need not be given the benefit of every inference but only of every *reasonable*

inference. *See Brown v. City of Clewiston,* 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### Causation Standard Under the AMLA

For purposes of this motion, the parties correctly agree that the court's determination is

guided by the AMLA because the defendants are healthcare providers. Therefore, the plaintiffs

must show that each doctor breached the applicable standard of care and that the breach

proximately caused Ameca-Rodriguez's injuries. The Alabama Supreme Court has stated the

relevant considerations as follows:

> "In medical malpractice cases, the plaintiff must prove negligence through
> the use of expert testimony, unless an understanding of the doctor's alleged lack
> of due care or skill requires only common knowledge or experience." *Monk v.
> Vesely,* 525 So. 2d 1364, 1365 (Ala. 1988). In cases where expert testimony is
> required, the plaintiff must establish through such testimony (1) that the defendant
> breached the standard of care and (2) that the breach proximately caused the
> injuries complained of. *Dobbs v. Smith*, 514 So. 2d 871 (Ala. 1987); *Howard v.
> Mitchell*, 492 So. 2d 1018 (Ala. 1986); *Lightsey v. Bessemer Clinic, P.A.*, 495 So.
> 2d 35 (Ala. 1986).

> In *Peden v. Ashmore*, 554 So. 2d 1010 (Ala. 1989), we stated the rule
> concerning the legal sufficiency of evidence on the element of proximate cause in
> a medical malpractice action:

>> "The plaintiff must adduce some evidence that the alleged
>> negligence probably caused the injury or death:

>>> "'In a medical malpractice case, in order to
>>> find liability there must be more than a mere
>>> possibility that the alleged negligence caused the
>>> injury. *Williams v. Bhoopathi*, 474 So. 2d 690, 691
>>> (Ala. 1985). There must be some evidence that that
>>> negligence probably caused the injury. *Orange v.
>>> Shannon*, 284 Ala. 202, 206, 224 So. 2d 236, 239
>>> (1969).'

3

"*Howard v. Mitchell*, 492 So. 2d 1018, 1019 (Ala. 1986)." 554 So. 2d at 1013 (emphasis in original).

*Willard v. Perry*, 611 So. 2d 358, 360 (Ala. 1992). Similarly, in *Bradford v. McGee By and*

*Through McGee*, 534 So. 2d 1076, 1079-80 (Ala. 1988), the court stated:

Section 6-5-484, Code of Alabama (1975), as we have construed it, imposes a legal duty upon doctors to exercise the degree of reasonable care, diligence, and skill that reasonably competent physicians in the national medical community would ordinarily exercise when acting in the same or similar circumstances. *Keebler v. Winfield Carraway Hospital*, 531 So. 2d 841 (Ala. 1988). To recover damages for an alleged breach of this duty, a plaintiff must produce evidence that establishes 1) the appropriate standard of care, *Keebler, supra; Dobbs v. Smith*, 514 So. 2d 871 (Ala. 1987), 2) the doctor's deviation from that standard, *Keebler; Dobbs*, and 3) a proximate causal connection between the doctor's act or omission constituting the breach and the injury sustained by the plaintiff. *Ensor v. Wilson*, 519 So. 2d 1244 (Ala. 1987); *Howard v. Mitchell*, 492 So. 2d 1018 (Ala. 1986). To present a jury question, the plaintiff must adduce some evidence indicating that the alleged negligence (the breach of the appropriate standard of care) probably caused the injury. A mere possibility is insufficient. The evidence produced by the plaintiff must have "selective application" to one theory of causation. *Howard, supra; Williams v. Bhoopathi*, 474 So. 2d 690 (Ala. 1985).

"What was said in *McClinton v. McClinton*, 258 Ala. 542, 544-45, 63 So. 2d 594, 597 (1952), is appropriate in this case:

"'Proof which goes no further than to show an injury could have occurred in an alleged way, does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause.'

"But a nice discrimination must be exercised in the application of this principle. As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deductible from them as a reasonable inference. *There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only.*" [Emphasis added.]

4

> "(Quoting *Southern Ry. Co. v. Dickson*, 211 Ala. 481, 486,
> 100 So. 665, 669 (1924).  *See, e.g.*, *McKinnon v. Polk*, 219 Ala.
> 167, 168, 121 So. 539, 540 (1929) (a case involving a suit for
> personal injuries allegedly caused by the negligence of the
> plaintiff's physician))."

*Howard* at 1020.

*Bradford*, 534 So. 2d at 1079-80 (italics in original).

## FACTS[2]

On Friday, February 11, 2000, Ameca-Rodriguez was grinding metal at Preformed Line Products (hereinafter "PLP") when a metal particle entered his left eye.  Although he reported the incident to PLP, he was sent back to work.  Over the following weekend, Ameca-Rodriguez experienced "excruciating pain."  (Am. Complaint at ¶ 14).  When he returned to work on Monday, February 14, 2000, he was placed back to work.

On Tuesday, February 15, 2000, he was sent to defendant Comptrac where he saw Dr. Roberts.  Although Ameca-Rodriguez speaks only Spanish, the doctor and the nurse, who spoke some Spanish,[3] were informed through an interpreter that he was injured when a metal particle entered his eye.  The nurse's notes state, "He believes he got a small piece of metal in left eye while grinding @ work on 2/11/00."  (Robert Medical Records at 3).[4]  Ameca-Rodriguez also informed Roberts of the excruciating pain.  The outward appearances that the plaintiff was

---

[2] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiffs.  They are the "'facts' for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)."  *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).  Although the court has in many instances delineated the opposing position on certain events, that was done for completeness.  The claims were viewed in a light most favorable to the plaintiffs.

[3] It appears that the nurse spoke only limited Spanish.  There is no indication that Roberts spoke any Spanish to assist in the diagnosis and treatment of the plaintiff.

[4] The medical records are located at document 94, exhibit D.

experiencing a problem with the eye included inflammation and redness.  Roberts examined the plaintiff.  He did not see a foreign body while conducting a visual inspection of the cornea and eyelids.  (Roberts Dep. at 67).[5]  Using an ophthalmoscope, he examined the plaintiff's eyes and noted "mild erythema" or redness in both eyes and conjunctiva.  (*Id.* at 79; Roberts Medical Records at 3).  Roberts also examined the plaintiff's visual acuity and determined that his vision was 20/40 in the affected eye.[6]  (*Id.*).  Roberts also performed a fluorescein dye test and found the "cornea intact - lids without F.B. Fluorescein normal."  (*Id.*).  He did not see any scratches or corneal defects, but did note a small cataract, and, according to Roberts, he was informed that the plaintiff had a previous injury as a child.  (Roberts Dep. at 77, 121-22, Medical Records at 3).  Roberts stated that "he [(the plaintiff)] did not seem to be in pain."  (Roberts Dep. at 67).  Absent any evidence of a foreign body or cornea penetration, Roberts authorized the plaintiff to return to work "without restrictions."  (Am. Complaint at ¶ 20; Medical Record at 3).  Roberts did not "give him a definite appointment" to return.  (Roberts Dep. at 159-60, 162).  He stated during his deposition that he usually tells the patient to return in a day or two and, if he continues to have problems, to call him.  (Roberts Dep. at 67, 159-62).

On Friday, February 18, 2000, Ameca-Rodriguez again sought treatment through PLP and was permitted to see Dr. Roberts.  However, when he arrived there, Roberts was not present.  Someone in Roberts' office directed the plaintiff to Shelby Baptist Medical Center that was located across the street.  (Am. Complaint at ¶ 21).

After arriving at the Medical Center, he was examined by Dr. Rhodes-Weisenfeld, the

---

[5] Roberts deposition is located at document 94, exhibit C.

[6] This is described by one expert as being "close to normal."  (Adler Dep. (located at document 86, exhibit B) at 246).

emergency room physician.  Her notes reflect that she believed that she observed a small "fleck"
when she was examining him with a slit lamp.  (Shelby Medical Records at 0005).[7]  Following
the evaluation, Weisenfeld contacted Dr. Powell, the on-call ophthalmologist for Ophthalmology
Associates.  Powell testified that he was told by Weisenfeld that she had a Hispanic patient that
did not speak English, that she had examined him and determined that something had fallen in
his eye, and that he had safety glasses on at the time of the incident.  (Powell Dep. at 239).[8]  She
did not tell him anything that indicated an intraocular foreign body.  (*Id.* at 243).  As a
consequence of the consultation, Ameca-Rodriguez was told to go to Powell's office on Monday
morning to be evaluated.  He was also told to call Powell if his condition worsened over the
weekend.  (Powell Dep. at 242-43).

    Ameca-Rodriguez was evaluated on the following Monday by Dr. Bruce Eich, Powell's
partner.  Eich ordered a CT scan and thereafter referred the plaintiff to the care of Dr. Richard
Feist, a retinal surgical specialist.

    Dr. Feist diagnosed that the plaintiff was suffering from a corneal laceration, a traumatic
cataract, and a total retinal detachment.  He operated on the plaintiff's eye, but was unable to
restore the plaintiff's eyesight.  Feist conducted a second surgery after the plaintiff continued to
experience pain.  He had to perform an evisceration, removing the affected eye.

    The plaintiff's ophthalmology expert, Dr. Michael Title, testified that the genesis of the
plaintiff's situation was the fact that a small metallic object entered the plaintiff's left cornea at
an angle, piercing the iris and the lens of the eye, and lodging in the vitreous body behind the lens

---

[7] The medical records are located at document 89, exhibit A.

[8] Powell's deposition is located at document 89, exhibit C.

and in front of the retina. (Title Dep. at 24-25).[9]  Although the penetration of the metal into the vitreous did not cause the detachment of the retina and the loss of the eye, it set up the "inflammatory reaction that eventually pulled the retina off" and resulted in the loss of the eye. (*Id*. at 173).

## DISCUSSION

In order to survive the defendants' motions for summary judgment, the plaintiffs are required to present sufficient evidence through expert testimony that the acts or omissions of each defendant probably caused the injury to Ameca-Rodriguez.  Each defendant's situation must be reviewed individually.

### Dr. Roberts' Motion

As to Dr. Roberts, his counsel asserts that Roberts exercised the requisite degree of care and that the plaintiff has failed to show that different treatment by Roberts would have produced a different result. (Doc. 95 at 11).  In support of his argument, Roberts states in conclusory fashion in his affidavit that he "met the standard of care in the treatment I rendered to Alfredo-Ameca Rodriguez [sic] on February 15, 2000." (Roberts Aff. at 1-2).[10]  Counsel for the plaintiffs asserts through her medical expert, Dr. Paul Adler, M.D., that Robert's deviated from the requisite standard of care in three ways.  First, he failed to conduct a "full exam, which would include . . . a Slit Lamp exam. . . ." (Adler Dep. at 261, 280).  Second, he did not provide Ameca-Rodriguez "with treatment, since giving him saline solution really does not treat anything." (*Id*.).  Instead, he asserts that Roberts should have provided him with "local

---

[9] Title's deposition is located at document 86, exhibit C.

[10] The affidavit is located at document 94, exhibit B.

antibiotics." (*Id.* at 264).  Third, Roberts should have arranged to see him the next day for

followup.  (*Id.* at 277-78).  Specifically, Adler quoted the following from his report during the

deposition:

> "The deviation from standard of care for this physician doing employee
> health is that any patient who still has symptoms and complaints of a foreign body
> five days after injury with a small metallic particle and who has conjunctivitis
> should receive local antibiotics.  He should be seen in the a.m. to see if there is
> relief and/or for absence of small metallic particle.
>
> "He should make use of all available occupational diagnostic equipment,
> i.e., Slit Lamp, ophthalmoscopy, and/or x-rays, especially if the industry exposes
> workers to high velocity metal particles.
>
> "If there is no quick resolution, then referral to an ophthalmologist is
> standard of care.  There is no evidence that that recommendation was made, which
> delayed Mr. Rodriguez's treatment for three or four more days which resulted in
> the eventual loss of his eye."

(Adler Dep. at 264-65).

Concerning the failure to use a slit lamp, the defendant asserts that this is insufficient to

satisfy the causation element because Title testified that the metal fragment was not visible

through the use of a slit lamp because of its location in the eye.  (Doc. 95 at 8).  In support of this

contention, counsel cites Title's testimony where he stated that Dr. Weisenfeld could not have

seen the metallic foreign body in a slit lamp.  (*Id.*, citing Title Dep. at 25-26).  Even accepting

this undisputed fact, the motion is still not due to be granted as to this defendant as will be

explained below.

Concerning the failure to use antibiotics, the record is clear that this was

"inconsequential" under the circumstances.  (Title Dep. at 135-37).[11]  Therefore, the court also

---

[11] The plaintiff's expert testified that using local antibiotics would be "inconsequential" because of the location of the
injury in the eye.  (Title Dep. at 135).

9

must conclude that this deficiency is not sufficient to satisfy the proximate cause standard with

regard to the plaintiff's loss of his eye.

Concerning the delay in treatment argument, which purportedly is due to Roberts' failure

to require a followup visit, the defendant asserts that the testimony of Title again shows that this

is inconsequential.  Specifically, counsel argues the following:

> It is undisputed that the plaintiff's eye became irreparable when the retina
> became detached.  However, there has been an absence of expert testimony, even
> by Dr. Title, as to when this occurred.  Dr. Title states as follows:
>
> Examination by Mr. Stakely:
>
> Q.    Let me ask you this way: You don't know when the retina
>       tore and became [de]tached?
>
> A     No.
>
> Q.    No opinion in that regard?
>
> A.    It would be unfair to have an opinion, because it would be
>       speculation.

(Doc. 95 at 10, citing Title Dep. at 98).  Although counsel is correct that speculation is

insufficient to overcome a motion for summary judgment, additional testimony from Title

precludes the granting of defendant Robert's motion in this case.  When Title was pressed by

counsel concerning when the retina detached and when the macula came off, he stated, in

pertinent part, that the detachment and separation occurred "[s]omeplace between the ER and

finally getting to see the doctor.  That's when it happened.  Somewhere in there."  (Title Dep. at

120).  Although there is additional colloquy between counsel and Title following these

statements, it is still evident that, at the time the plaintiff was seen by Roberts, his vision was

20/40, indicating that the macula was still attached.[12]  (*See id.* at 116-17).  Thus, counsel's argument that Roberts' failure to followup is inconsequential is not sufficient to warrant the granting of his motion for summary judgment.

To the extent that counsel further argues that there is a lack of causation testimony in general, the court finds otherwise.  While being questioned whether the later actions or inactions of Powell contributed to the plaintiff's loss of his eye, Title stated that "the longer the condition remained untreated, the worse the prognosis became.  Would it have been different had it been seen earlier?  My crystal ball is a little cloudy today.  Is the likelihood that it could have been salvageable better if it had been seen earlier?  Certainly."  (Title Dep. at 174-75).  Additionally, Title testified that although he could not specifically identify when the situation became "hopeless," he did say that "with each day that went by, the chances of a successful resolution diminished."  (*Id.* at 162).  Premised on this testimony, Dr. Roberts' motion is due to be denied at this juncture.

### Dr. Rhodes-Weisenfeld's Motion

As to Rhodes-Weisenfeld, defense counsel similarly asserts that the plaintiffs have failed to proffer an expert who can testify that Rhodes-Weisenfeld's alleged negligence caused the injury to Ameca-Rodriguez.  (Doc. 102 at 8-9).  Counsel further asserts that the pertinent issue is "Whether Mr. Rodriguez's vision probably could have been salvaged when Dr. Rhodes-Weisenfeld first saw him on the afternoon of Friday, February 18th, 2000, if she had referred Mr. Rodriguez for opthalmalogic treatment on February 19th instead of February 21st, 2000."  (*Id.* at

---

[12] Whether the macula is attached or how long it has been detached is significant in that the longer it "stays off, the less likely you are to ever recover useful vision." (Title Dep. at 119). Title specifically stated that the earlier the intervention, "the more likely [the plaintiff] would have had . . . some sort of vision in the eye. At least salvage the globe." (*Id.* at 163-64).

1). In support of the motion, counsel cites the recent Alabama Supreme Court cases of *DCH Healthcare Authority v. Duckworth*, ___ So. 2d ___, 2003 WL 22977442 (Ala. December 19, 2003) and *Bradley v. Miller*, ___ So. 2d ___, 2003 WL 22221253 (Ala. September 26, 2003). The plaintiffs principally rely on *Parker v. Collins*, 605 So. 2d 824 (Ala. 1992), and *Thomas v. Ekambaram*, 706 So. 2d 1245 (Ala. 1997), in support of their argument that the evidence on causation is sufficient.

In *Duckworth*, an 83-year-old patient went to the defendant's facility on October 9, 1999, to pick up his wife who was being discharged. While at the facility, he fell and struck his head. He was taken to the emergency department at 10:24 a.m. At 10:59 a.m., the emergency-department physician examined him and ordered an X-ray, which began at 12:36 p.m. For approximately 45 minutes preceding the X-ray examination, Duckworth waited in the hallway of the radiology department. During this time he developed a headache and nausea. He vomited during and after the X- ray examination. At 1:17 p.m., the doctor ordered a computerized tomography scan ("CT scan"), which was performed at 1:54 p.m. At 2:00 p.m., the radiology department notified emergency-department personnel that Duckworth had a subdural hematoma. At approximately 2:15 p.m., he was relocated to the critical-care unit, and a neurosurgeon was called to relieve the hemorrhage. He arrived at the center at approximately 3:15 p.m. Surgery began at 4:40 p.m. and was completed at 6:00 p.m. Duckworth remained hospitalized until October 22, 1999, when he died as a result of the injuries he sustained in the fall. Mrs. Duckworth sued the defendant, "alleging that Dr. Nelson and the other emergency-department personnel 'caused or negligently allowed [Mr. Duckworth] to go without proper and timely evaluation, monitoring, care, and treatment for a potential closed-head injury,

12

and failed to timely and properly address, observe and report changes in his condition.' The complaint further alleged that as a consequence of the alleged negligence, Mr. Duckworth 'was caused to worsen with a cerebral bleed and he was so injured that he died.'" *Id.* at \*1. At the close of the plaintiff's evidence and at the close of all the evidence, the defendant moved for a judgment as a matter of law. The defendant asserted that the plaintiff failed to present substantial evidence of causation by expert testimony. The trial court denied the motions, and a jury awarded the plaintiff $350,000. The defendant filed a post-verdict motion for a judgment as a matter of law that was deemed overruled by operation of law, pursuant to ALA. R. CIV. P. 59.1. The defendant appealed.

On appeal, the plaintiff directed the Court to various portions of the testimony of her expert in "support of her argument that a more expeditious 'diagnosis and treatment' would have placed her husband in a 'better position than [he] was in as a result,' . . . of the two- or three-hour diagnostic period of which she complains." *Id.* at \*3 (citation omitted). After quoting large portions of the testimony of the plaintiff's expert and citing to and discussing the holdings in *McAfee v. Baptist Medical Center*, 641 So. 2d 265 (Ala. 1994), the Alabama Supreme Court reversed the trial court and ordered that judgment be entered on behalf of the defendant, stating that the plaintiff's expert "opinion does not constitute substantial evidence that the two- or three-hour delay of which Mrs. Duckworth complains probably adversely affected Mr. Duckworth's response to treatment." *Id.* at \*6. Specifically, the court was not impressed by the expert's general statements that treatment "as soon as possible is 'always the ideal,' and 'any

13

delay in diagnosis can adversely affect a person's condition.'"[13] *Id.* at \*6.

In *Bradley*, the plaintiffs brought a medical malpractice action against the defendant doctor arising from her failure to classify a mother's pregnancy as high risk and for failure to timely diagnose the mother's preeclampsia, which allegedly resulted in the death of the baby. The defendant moved for summary judgment, asserting that the "plaintiffs could not produce the expert medical testimony regarding proximate cause required of plaintiffs to withstand summary judgment . . . because the evidentiary foundation for such . . . did not exist." *Id.*, 2003 WL 22221253 at \*1. The defendant argued that because (1) the evidence established only that the mother did not suffer from preeclampsia when the defendant saw her for the last time on April 15, 1999, and that the mother was suffering from preeclampsia when she was next seen by a physician on May 23, 1999, the day the child died and (2) no evidence established the onset of the mother's preeclampsia or whether the onset was gradual or sudden, the plaintiffs' expert could only speculate "that the fetus probably would be have been saved in the absence of the alleged breaches of the standard of care. . . ." *Id.* The trial court granted summary judgment and the plaintiffs' appealed.

After setting forth the applicable standards, including that the expert medical evidence

---

[13] The court analogized the expert testimony in *Duckworth* to the affidavits in *McAfee* wherein the experts made similar general statements:

> The affidavit of the plaintiffs' expert, Dr. O. Carter Snead III, offered a conjectural observation that, generally, the sooner the onset of treatment, the better the expected result. There is no evidence that the actions of Dr. Dorand or those of Dr. Gillis Payne, who first saw the baby, probably caused the poor outcome. In the second case, the plaintiffs submitted affidavits stating, generally, that "time is of the essence" in treating breast cancer, and that patients who receive earlier treatment obtain a better result. There was no expert testimony to rebut the testimony submitted by the defendants indicating that the metastasis to the lymph nodes probably occurred in the early stages before the cancer could be diagnosed. The affidavits of the plaintiffs' experts did not rise to the level of substantial evidence that the actions of the defendants probably caused Brenda Roberts's injuries.

*Duckworth*, 2003 WL 22977442 at \*5 (citing *McAfee*, 641 So. 2d at 268).

14

must show that the alleged negligence probably caused the plaintiff's injury, the Alabama

Supreme Court affirmed the lower court's decision, stating as follows:

> In essence, the plaintiffs' expert opined that, if [Defendant] Dr. Miller had monitored Chrissy [(the mother)] more closely for pregnancy complications other than preeclampsia, Dr. Miller would have incidentally detected the onset of Chrissy's preeclampsia in time to effect an early delivery of the fetus before the preeclampsia killed the fetus. However, the necessary evidentiary foundation for such an opinion did not exist. The undisputed evidence affirmatively established that Chrissy did not suffer from preeclampsia as of April 15, the last time Dr. Miller saw Chrissy. Moreover, there was no evidence to establish that Chrissy suffered from preeclampsia before the hospital checked her blood pressure on the night of May 23 and found it above 140/90. The plaintiffs did not even present any evidence that Chrissy's cramps and vaginal discharge established that she suffered from preeclampsia on May 22. Given this state of the evidence, the plaintiffs' expert could only speculate about the timing and manner of the onset of Chrissy's preeclampsia and, in turn, the rapidity of the adverse effects of the preeclampsia on the fetus. This speculation, in turn, was the only available foundation for the conclusory opinion of the plaintiffs' expert that the fetus could have been saved if Dr. Miller had monitored Chrissy more closely, for instance, by seeing Chrissy on May 6, the date of the cancelled appointment. Because the foundation for the expert's conclusory opinion consisted entirely of speculation, the conclusory opinion itself could be only speculation. Because the conclusory opinion of the plaintiffs' expert that the child could have been saved with closer monitoring was only speculation, it did not constitute substantial evidence of proximate causation.

*Bradley*, 2003 WL 22221253 at *4.

In *Thomas*, the plaintiff alleged that the defendant doctor breached "the standard of care

in 'treat[ing her] for a sprain to [her] left wrist when she had presented for treatment of cat bites

to her left hand' and in 'fail[ing] to administer appropriate antibiotic therapy.'" *Id.*, 706 So. 2d at

1246. The defendant filed a motion for a summary judgment contending that the plaintiff failed

to adduce substantial evidence that his alleged negligence had proximately caused her medical

conditions. *Id.* The plaintiff filed an affidavit executed by her expert which provided, in

pertinent part, as follows:

15

> "I have examined the emergency room records . . . relating to Dean
> Thomas and her treatment and examination by Dr. Ekambaram on October 2,
> 1992.  Based upon this information, it is my professional opinion that Dr.
> Ekambaram, in the examination and treatment of Ms. Thomas, failed to exercise
> such reasonable care, skill, and diligence as other similarly situated health care
> providers in the same general line of practice, ordinarily have and exercise in a
> like case.  "It is further my professional opinion that Dr. Ekambaram's failure to
> meet this standard of care, probably caused her condition and that said breach of
> the standard of care adversely affected her condition."

*Id*.  The trial court granted the motion for summary judgment, stating that the plaintiff "'did not

provide the required expert testimony sufficient to submit the issue of causation' to the trier of

fact, and that Thomas had 'failed to present substantial evidence that [Dr. Ekambaram] probably

caused [Thomas's] injury or that earlier antibiotic treatment would have affected the outcome in

this case.'"  *Id*. at 1247.  In reversing the granting of the motion, the Alabama Supreme Court

stated as follows:

> In support of his motion for summary judgment, Dr. Ekambaram
> submitted excerpts[ ] from Dr. Walter's deposition transcript wherein Dr. Walter
> testified that (1) some patients will develop an infection or other significant
> problems following a cat bite wound despite antibiotic therapy and other
> appropriate treatment; (2) he could not say whether the antibiotic Rocephin, which
> he believes should have been administered, would have "covered" (i.e., treated)
> Thomas's infection; and (3) he could not say whether Thomas would have
> developed an escalating infection without antibiotic therapy.  However, although
> Dr. Walter admitted that he could not quantify the precise increase in likelihood of
> a favorable outcome without resorting to speculation, he testified that antibiotic
> therapy would have increased the likelihood of a favorable outcome.  Dr. Walter's
> testimony is consistent with the opinion he expressed in his affidavit that Dr.
> Ekambaram's alleged failure to meet the standard of care "probably caused her
> condition and . . . adversely affected her condition."  This is all that is required: "It
> is not necessary to establish that prompt care could have prevented the injury or
> death of the patient; rather, the plaintiff must produce evidence to show that [her]
> condition was adversely affected by the alleged negligence."  *Travis v. Scott*, 667
> So. 2d 674, 678 (Ala. 1995) (quoting *Parker v. Collins*, 605 So. 2d 824, 827 (Ala.
> 1992)).  Viewing the evidence presented below in a light most favorable to
> Thomas as the nonmovant (*see Long*, 623 So. 2d at 1132), we conclude that
> Thomas has demonstrated by substantial evidence that Dr. Ekambaram's alleged

> breaches of the standard of care adversely affected her condition, and that a
> genuine issue of material fact exists concerning proximate causation. Thus, the
> trial court erred in granting Dr. Ekambaram's motion for a summary judgment.
> The summary judgment is reversed and the cause is remanded for further
> proceedings.

*Id.*, 706 So. 2d at 1248 (footnote omitted).

In *Parker*, the plaintiffs alleged that the defendant negligently performed a mammogram upon the plaintiff's wife and that he then negligently interpreted the test results to be negative. They specifically "argued that the X-rays Dr. Collins had interpreted were plainly inadequate and that he was negligent in basing his diagnosis upon them. They further argued that with earlier detection of the cancer Mrs. Parker would have avoided chemotherapy and radiation treatment and would have had a better chance for long-term survival. *Id.*, 605 So. 2d at 826. The plaintiffs premised their causation arguments on the expert testimony of several radiologists. The first "testified that the film was 'grossly technically inadequate and suboptimal for interpretation' and that Dr. Collins violated the accepted standard of radiology care by basing his diagnosis upon it." *Id.* A second radiologist also found the "X-rays to be significantly substandard." *Id.* A cancer specialist testified as to the delay in diagnosing the plaintiff's condition, specifically finding that "he was 80% certain that the cancer had not spread into" her lymph nodes as of the first X-ray. *Id.* The plaintiff's surgeon testified that the course of chemotherapy and radiation treatments that followed her surgery "were necessary, because the cancer had spread into her lymph nodes." *Id.* He also testified that breast cancer "has a higher rate of recurrence once it has spread into the lymph glands." *Id.* The trial court granted the defendant's motion for a directed verdict finding that "there was no evidence to show that the inferior X-rays caused Mrs. Parker to undergo a course of treatment in December 1988 that she would not have had to endure [at the time of the

first X-ray]." *Id.* It concluded that "the element of causation had not been established." *Id.* at

827. Applying the "substantial evidence" standard, the Supreme Court reversed the lower court's

decision, stating as follows:

> In this case, we find such evidence. While the facts do not establish that Mrs.
> Parker's cancer could have been prevented altogether if Dr. Collins had rendered a
> prompt diagnosis based on a clearer X-ray, medical testimony suggests that Mrs.
> Parker's condition worsened as a direct result of a diagnosis based upon a
> substandard X-ray. That evidence was sufficient to create a jury question as to
> proximate cause in this case; accordingly, we reverse that portion of the judgment
> based on the directed verdict for Dr. Collins.

*Id.* The expert testimony in *Parker* was sufficient for a jury to infer that the physician's

negligence probably caused her injury. *McAfee By and Through McAfee v. Baptist Medical*

*Center*, 641 So. 2d 265, 267 (Ala. 1994).

Counsel for defendant Weisenfeld is correct that neither *Thomas* nor *Parker* "abrogate the

requirement that the plaintiff must prove that the alleged negligence 'probably caused the

injury.'" (Doc. 102 at 4). The pertinent question is whether the voluminous evidence from the

depositions of the experts, Dr. Adler and Dr. Title, is adequate to meet that standard as to Dr.

Weisenfeld. If their testimony "is conclusory, speculative, and without a proper evidentiary

foundation [it] cannot create a genuine issue of material fact." *Bradley*, 2003 WL 22221253 at

*4.

The court finds that at this juncture the evidence is sufficient to create a genuine issue of

material fact precluding summary judgment in favor of Dr. Weisenfeld. During Title's

deposition, counsel asked him whether it would have made a difference in the outcome if the

18

plaintiff had had his surgery on the 21st instead of on the 23rd.[14]  A lengthy colloquy occurred in response.  (Title Dep. at 114-120).  During this questioning, Title did state, as noted previously, that the macula detachment and separation occurred "[s]omeplace between the ER and finally getting to see the doctor.  That's when it happened.  Somewhere in there."  (Title Dep. at 120).  This is supported by the medical records of Shelby Baptist Medical Center that demonstrated that the plaintiff's vision in his left eye was "20/200" when he entered the emergency room.  (Shelby Med. Records at 006).[15]  Whereas, the plaintiff's left eye had light perception only when the arrived at Ophthalmology Associates on Monday, February 21, 2000.  (Ophthalmology Associates Records at 0005).[16]  The court therefore finds that Weisenfeld's motion for summary judgment is due to be denied because the evidence, when viewed in a light most favorable to the plaintiffs, shows that Ameca-Rodriguez probably would have been in a better position had he been immediately seen by the ophthalmologist instead of waiting until the following Monday.[17] Dr. Title also testified "that the earlier the inflammation was stopped, the less likelihood of a total retinal detachment."  (Title Dep. at 144).  He followed-up, stating as follows:

> . . . . The reason that nothing could be fixed was because of the funnel-shaped retinal detachment.  The reason for the funnel-shaped retinal detachment was the period of time that delayed recognizing what was going on.
>
> Caught earlier, it's quite possible the macula would not have been detached, or for as long a period.  The shorter the period of time the macula is off,

---

[14] Counsel used this date, assuming, correctly or not, that Ameca-Rodriguez would not have been taken to surgery any earlier because of the two days it took to get him to surgery after his initial consult with Dr. Eich.  (Title Dep. at 114-16).

[15] These medical records are located at document 89, exhibit A.

[16] These medical records are located at document 89, exhibit B.

[17] Unlike the general opinions in *Duckworth* and the conclusory opinions that were premised on speculation in *Bradley*, the expert opinions and the relevant medical records in this case are sufficient to overcome the motions for summary judgment.

the less likely it is that you have an inoperable case or that you would not be able
to restore vision.

(Title Dep. at 145). Finally, the court again notes that Dr. Title concluded near the end of his

deposition saying, "Is the likelihood that it [(Ameca-Rodriguez's eye)] could have been

salvageable better if it had been seen earlier? Certainly." (Title Dep. at 174-75). The court finds

the totality of the evidence sufficient under the circumstances.

Dr. Powell opines that "[i]t is [his] professional medical opinion that, at [the time

Rodriguez presented to the emergency room], his left eye was probably not salvageable and his

ultimate evisceration was unavoidable." (Powell Affidavit at 2).[18] Dr. Feist opined that "earlier

intervention by an ophthalmologist would, more likely than not, have made no difference in the

ultimate outcome. In other words, ophthalmologic surgery on Mr. Rodriguez on February 18,

2000 would have offered no better outcome than the surgery he underwent on February 23, 2000,

as, more likely than not, he still would have suffered an irreparable retinal detachment and loss of

the left eye." (Feist Aff. at ¶ 4).[19] Construing these contentions with the previous testimony, the

court finds that they create an issue of material fact for resolution by the jury.

### Dr. Powell's Motion

Dr. Powell similarly asserts that the plaintiffs' evidence is insufficient to show that

Ameca-Rodriguez's "injuries *probably* resulted from Dr. Powell's decision not to actively treat

him on February 18, 2000." (Doc. 90 at 9) (italics in original). Counsel relies in part on the

decision of the Alabama Supreme Court in *Howard v. Mitchell*, 492 So. 2d 1018 (Ala. 1986).

---

[18] Powell's affidavit is located at document 89, exhibit F.

[19] Feist's affidavit is located at document 89, exhibit D.

In *Howard*, the plaintiff sued her obstetricians for medical malpractice that resulted in the loss of her child shortly after birth. She alleged that the physicians failed to place her on a medication ten years earlier that would have prevented the formation of certain antibodies that caused the death of the child following a subsequent pregnancy. *Howard*, 492 So. 2d at 1019. The trial court granted summary judgment and the Supreme Court upheld the same, stating,

> According to the deposition of the plaintiff's own expert, it would admittedly be pure conjecture or speculation as to when the plaintiff developed the Rh positive antibodies. Although there was a three to five percent chance she developed them after the spontaneous abortion, there was more than an "equal probability," specifically, there was a twenty percent chance, that the development could be attributed to another cause, i.e., the full term pregnancy in 1972. In effect, the evidence produced by the plaintiff was without "selective application" to any one theory of causation. Thus, any conclusion that the defendants' alleged negligence led to the development of the Rh positive antibodies would be based on pure speculation or conjecture, which is an improper basis for a jury verdict. *See*, *Thompson v. Lee*, 439 So. 2d 113, 115 (Ala. 1983); *Alabama Power Co. v. Smith*, 409 So. 2d 760, 763 (Ala. 1982).
>
> Furthermore, Dr. Krane's deposition testimony indicated that there was only a mere possibility that the alleged negligence of the defendants caused the death of the plaintiff's child. Under the standard set forth in medical malpractice cases, this was not enough to present a jury question. There must be some evidence that the alleged negligence probably caused the injury. *Williams v. Bhoopathi*, *supra*; *Orange v. Shannon*, *supra*. In the absence of any evidence that the defendants' negligence probably caused the death of the plaintiff's child, the trial court properly granted the summary judgment.

*Howard*, 492 So. 2d 1020.

The court finds *Howard* to be factually distinguishable from the present case. Dr. Title was quite emphatic that Dr. Powell should have recognized this matter was an emergency, requiring that he see Ameca-Rodriguez that night. (Title Dep. at 159-61). Additionally, the foregoing discussion concerning Title's testimony regarding causation is similarly applicable to Powell's situation. There is a jury question on the issue of proximate cause. Had he seen the

plaintiff the night that he was in the emergency room, the evidence arguably shows that the

probability of a different result would have been greater due to the temporal proximity to the

original injury.  Title clearly states that the macula detachment and separation occurred

"[s]omeplace between the ER and finally getting to see the doctor."  (Title Dep. at 120).  As

concluded previously on the other motions, the court again finds this testimony and the related

medical records sufficient to overcome Powell's motion for summary judgment.

## CONCLUSION

Premised on the foregoing, the defendants' motions for summary judgment are due to be

denied.  An appropriate order will be entered.

The Clerk of the Court is directed to serve a copy of this memorandum opinion upon

counsel of record in this matter.

**DONE**, this the _____ day of December, 2003.

JOHN E. OTT
United States Magistrate Judge